# JOHN ROGERS v. STATE.

No. A-8793.   July 26, 1935.
(48 Pac. [2d] 344.)

M. W. Gross and J. H. Warren, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Smith C. Matson, Asst. Atty. Gen., and O. A. Brewer, Co. Atty., for the State.

DOYLE, J. The information in this case filed in the district court of Choctaw county, April 26, 1933, charged that on or about February 18, 1931, the defendant committed the crime of arson. The charging words are:

"That he, the said John Rogers, then and there being, did then and there willfully, wrongfully, unlawfully, maliciously set fire to, fire, cause to burn in the nighttime, a certain dwelling house of John Campbell, said dwelling then and there being inhabited by John Campbell and family, contrary to," etc.

On his trial the jury returned a verdict finding him guilty of arson in the second degree and assessing his punishment at imprisonment in the penitentiary for five years. Motion for a new trial was presented and overruled. From the judgment rendered in pursuance of the verdict on February 22, 1934, the defendant appeals.

A substantial statement of the material evidence is as follows:

W. C. Henry testified that he was fire chief in Hugo, February, 1931; that the John Campbell residence fire occurred February 18, 1931, at 3:45 a. m.; that from his experience as fire chief would say that the fire was of incendiary origin, and from his knowledge of fires he decided it was a coal oil or gasoline fire.

Jim Mooney testified that he is now serving a term in the penitentiary of this state, lived in Hugo in the year 1931, the defendant was at his house and they planned to do the work; that he could not recall just exactly how it happened. They got a pint of liquor, got "kinda gee'd up"

a little and talked about making plans to do away with this house; that the defendant said, "it would be $50 apiece to us." He did not know whether anything was said or not about getting any property out of the house, but anyhow they got some stuff out of the house. There was a 5-gallon can with gas or coal oil in it in the garage at the place, and that night they started to throw it up in the house. His wife and boy and his wife's half sister, Myrtle Robinson, were at his home that night; that they got a few clothes out of the house and some knives, forks, spoons and some plates and a 12-gauge shotgun. They put the stuff in sacks and carried them to witness' home, then came back and witness got in the loft and sprayed the oil and gas, then he came out and he supposed John set fire to it; that they left the place together and walked off down the street to witness' home; that Rogers went on home, and came back that night and got a couple of sacks of the stuff that he had left in the barn or the garden; that witness took his sack into his house and took a part of the stuff out, that his wife and Myrtle Robinson were present.

Mrs. Jim Mooney testified that John Rogers came by one morning and wanted to know where Mooney was, and she told him he had gone to town. Rogers said, "I have a deal on for us," she asked what kind of a deal and he said "Well, a house burning," she said "Well, I don't want Mooney into anything like that," he said "Aw, Kid, come on across with us, it's just 50 bucks apiece for us"; that on the 17th of February, 1931, Rogers was in their home and said to Mooney "Come on out," and they left her home in a car and stayed away a right smart while, then came back and left again, it was then getting dark. That along about 9 or 10 o'clock they got back with the sacks.

On cross-examination she stated that both of them to-

gether never did talk about burning this house before her until that night; that when they came back to her house about 10 o'clock that night each had a sack, and Rogers carried his on off; that she heard the fire alarm that night and it was not but a short time after the fire alarm until they came back; that Mooney, her husband, brought bed sheets, pillow cases, and other things home; that Jim Mooney and witness are now divorced.

Myrtle Robinson testified that she lives in Dallas, Tex., and was visiting Mrs. Mooney, her half sister, when the Campbell fire occurred; that John Rogers came to the Mooney home and they were planning something; that she was in the next room and could hear them talking; they said they were going out on a job, they called it, and Jim Mooney said Lawyer Gross furnished him the money to fix it with. They fixed a flashlight and left. They said they were going to steal some whisky. That the next morning she noticed some silverware, a looking-glass, shotgun shells and pistol cartridges in a dresser drawer; that not long after she went to the county attorney's office and reported that this property was at the Mooney home.

E. L. Hamby testified that in the fall of 1931 he traded a 25-20 Winchester to John Rogers for a 12-gauge Damascus shotgun.

Louis Compton testified that he heard John Rogers say he was at home that night of the fire and heard him say that he was at Red Osborn's that night.

On behalf of defendant, Jim Osborn, usually called "Red," testified that the night of the fire his baby was sick and John Rogers was at his home sitting up with the baby.

Manus Parden testified that the night of the fire he

called at Bond's store for his daughter and Miss Hines and was looking for Elsie Morris, who lived at the same place he did and who had a sick baby; that he called at Jim Osborn's a little after midnight and John Rogers came to the door and he asked if Elsie Morris was there, that she had a sick baby and he was looking for her, and Rogers said that he was sitting up with Osborn's sick child; that Red Osborn lived about a mile from the John Campbell house.

As a witness in his own behalf, John Rogers testified that he had nothing to do in any way with the burning of the John Campbell house; that he was at home until 9 or 10 o'clock, then went to Jim Osborn's and stayed the rest of the night, sitting up with their sick baby; that old man Ed Kirk was there a part of the time, and Manus Parden came there late in the night; that he knew nothing about any property being taken from the Campbell house.

Ed Kirk testified that he was at Red Osborn's house the night of the fire and John Rogers sat up that night with Osborn's sick baby; that there were four or five persons there a part of the time and a man called Parden called there in the middle of the night and asked for Elsie, old man Henry's daughter-in-law, and Rogers told him she was not there. The next morning somebody came along and said the old chief's house burned up. On cross-examination he was asked: "Q. How long have you lived in Hugo? A. I hauled the first plank that was nailed in Hugo."

In rebuttal, Jim Mooney testified that John Rogers said, when leaving Mooney's house that night, that he was going to Red Osborn's.

The grounds of the motion for a new trial and here assigned as error are:

Error of the court in denying a continuance, and that the verdict is contrary to law and to the evidence, and was the result of passion and prejudice of the jury, in assessing the maximum penalty.

We think it was an abuse of discretion to deny the application for a continuance upon the showing made. However, the only question that we deem necessary to consider is the alleged insufficiency of the evidence to support the verdict.

To prove the corpus delicti of arson, it must be shown not only that the building was burned, but also that it was burned by the willful act of some person criminally responsible, and not as the result of natural or accidental causes. Where a building is burned, the presumption is that the fire was caused by accident or natural causes rather than by the deliberate act of the accused. 3 Cyc. 1003.

The fact that the house was burned was shown by the testimony of the city fire chief. He said that it smelled of coal oil or gasoline, and that the fire was of incendiary origin. The evidence against the defendant was that of the accomplice, Mooney, a self-confessed thief, who was then serving a term in the penitentiary for some other crime. He was the only witness who testified as to the facts and circumstances of the commission of the crime charged.

We think the evidence was prima facie sufficient to establish the corpus delicti.

The rule of law forbidding a conviction upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense is, under the statute (section 3071, St. 1931), positive and peremptory.

"The corroborative evidence must of itself, and without the aid of the testimony of the accomplice, tend in some degree to connect the defendant with the commission of the offense; and independent evidence merely consistent with the main story is not sufficient corroboration if it requires any part of the accomplice's testimony to make it tend to connect the defendant with the crime."

"There must be some evidence, which of itself, and without aid from the accomplice's testimony, tends to connect the defendant with the offense committed."

"It is not sufficient corroboration to prove that the crime was committed in the manner described by the accomplice, but his testimony must be corroborated as to the particular defendant."

"It is not sufficient for this purpose merely to connect the defendant with the accomplice, or other person participating in the crime, but evidence, independent of the testimony of the accomplice, must tend to connect him with the crime itself, and not simply with its perpetrators."

"The corroborating evidence may be sufficient although by itself slight, but it is not sufficient if it merely tends to raise a suspicion of guilt." 1 Enc. of Ev. pp. 104, 105, 106, and 108, and cases cited.

Under the statute, section 3071, supra, there cannot be a conviction unless there is proof of substantial facts tending to connect the defendant with the commission of the offense, aside from and without the aid of the accomplice's testimony, and it is self-evident that the main fact in this case cannot be corroborated by a collateral fact, the existence of which is dependent upon the same class of testimony. Kirk v. State, 10 Okla. Cr. 281, 135 Pac. 1156; State v. Wilks, 17 Okla. Cr. 247, 187 Pac. 813; Wever v. State, 22 Okla. Cr. 414, 211 Pac. 1062.

Independent of the testimony of the accomplice, Mooney, there is no substantial evidence tending to con-

nect the defendant with the commission of the crime charged. The testimony of Mrs. Mooney tended only to show that certain goods were brought to her home by her husband, and the defendant was with him; she fixes the time about 10 o'clock, when the undisputed fact is that the fire occurred nearly four hours after midnight.

No witness saw the defendant at the house or observed him anywhere in its vicinity on the day or the night of the fire, or at any other time. Nor were there any circumstances disclosed tending to connect him with the commission of the crime. His testimony and that of his witnesses tended to show that he did not leave his home that night until about 10 o'clock, and was at the Osborn home from before midnight until morning.

The testimony of the state's witness, Miss Robinson, to the effect that she reported to the county attorney that this property was at the Mooney home shows that she did not mention the defendant at that time.

The owner of the building burned or of any property therein did not testify, and there was no proof of nonconsent to the taking of any property therein.

It appears the information was filed more than two years after the alleged date of the crime, and the case was not called for trial until about three years after said date. No reason for this delay appears in the record.

The statutory definition of arson is the willful and malicious burning of a building with intent to destroy it.

It appears the information was drawn under sections 1849 and 1851, St. 1931, reading as follows:

"1849. Arson is the willful and malicious burning of a building, with intent to destroy it."

"1851. Any building is deemed an 'inhabited building' within the meaning of this article, any part of which has usually been occupied by any person lodging therein at night."

The statute makes the intent to destroy a necessary element of the offense, and must be pleaded in the information. If the intent was merely to burn a building, then the word "willfully" in the information would be sufficient. While "willful" in the statute means "intentional," it means only an intent to burn, and not an intent to destroy, as destruction is not necessary to the commission of the crime of arson.

The information in this case does not charge that the burning was felonious, and does not aver an intent to destroy. However, the record shows that no demurrer was interposed or objection made as to the sufficiency of the same to state a public offense. It will be seen from the foregoing that the information is not sufficient to charge the crime of arson.

The state only demands the punishment of a citizen when his guilt has been clearly established according to the forms and rules of law, prescribed for ascertaining his guilt. It is not to shield the guilty, but to protect the innocent, that the courts are steadfast in upholding the forms and rules of law by which it may be lawfully determined who are guilty.

Upon careful consideration of the evidence, we are satisfied that the testimony of the accomplice, Mooney, was not corroborated as the law requires, and, for this reason, the verdict was contrary to law and the evidence. The judgment is therefore reversed.

DAVENPORT, P. J., and EDWARDS, J., concur.